## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

A.C.H.C., a minor, by and through her next friend
and stepfather, JOSE C., of El Salvador;
B.B.H.C., a minor by and through her next friend
and stepfather, JOSE C., of El Salvador; J.S.C.C.,
a minor, by and through his next friend and
father, JOSE C., of El Salvador.

*Petitioners*,

v.

WILLIAM P. BARR, in his official capacity as
United States Attorney General, 950
Pennsylvania Ave., NW, Washington, D.C.
20530; EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW, 5107 Leesburg Pike,
Falls Church, VA 22041; JAMES McHENRY, in
his official capacity as Director of Executive
Office for Immigration Review, 5107 Leesburg
Pike, Falls Church, VA 22041; U.S.
DEPARTMENT OF HOMELAND SECURITY,
245 Murray Lane, SW, Washington, D.C. 20528;
CHAD F. WOLF, in his official capacity as
Acting Secretary of the U.S. Department of
Homeland Security, 245 Murray Lane, SW,
Washington, D.C. 20528; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT, 500 12th
St., SW, Washington, D.C. 20536; FRANCISCO
MADRIGAL, in his official capacity as Acting
Field Office Director for the U.S. Immigration
and Customs Enforcement, 31 Hopkins Plaza, 6th
Floor, Baltimore, MD 21201; MATTHEW T.
ALBENCE, in his official capacity as Deputy
Director and Senior Official Performing the
Duties of the Director of the Immigration and
Customs Enforcement, 500 12th St., SW,
Washington, D.C. 20536; U.S. CITIZENSHIP
AND IMMIGRATION SERVICES, 20
Massachusetts Ave., NW, Washington, D.C.
20529; KENNETH T. CUCCINELLI, in his
official capacity as Senior Official Performing the
Duties of the Director of U.S. Citizenship and

Case No. _____

**PETITION FOR JUDICIAL
REVIEW OF PLACEMENT
PURSUANT TO *FLORES*
SETTLEMENT AGREEMENT
AND PETITION FOR HABEAS
RELIEF**

Immigration Services, 20 Massachusetts Ave.,
NW, Washington, D.C. 20529; U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, 200 Independence Ave., SW,
Washington, D.C. 20201; ALEX AZAR, in his
official capacity as Secretary of the Department
of Health and Human Services, 200 Independence
Ave., SW, Washington, D.C. 20201; OFFICE OF
REFUGEE AND RESETTLEMENT, 330 C
Street, SW, Washington, D.C. 20201;
JONATHAN HAYES, in his official capacity as
Director of the Office of Refugee and
Resettlement, 330 C Street, SW, Washington,
D.C. 20201; HILDAMARIA POWELL, in her
official capacity as Federal Field Specialist at the
Office of Refugee and Resettlement, 330 C
Street, SW, Washington, D.C. 20201;
BETHANY CHRISTIAN SERVICES, 2142
Priest Bridge Court #1, Crofton, MD 21114;
OLUBUNMI AKINKUOWO, in her official
capacity as Executive Director of Bethany
Christian Services, 2142 Priest Bridge Court #1,
Crofton, MD 21114.

*Respondents.*

## INTRODUCTION

1.      Petitioners A.C.H.C., B.B.H.C., and J.S.C.C. are minor siblings from El Salvador

who are now in the custody of the Office of Refugee Resettlement ("ORR") at a shelter for

unaccompanied immigrant children in Crofton, Maryland. They have suffered physical and sexual

assault; endured illness, extreme temperatures, and malnutrition; have now been separated from

their father, mother, and sister/stepsister due to the Respondents' policies and practices; and

currently are at risk of being deported to a country where they have faced death threats and where

they have no parent or other relative or guardian to receive them. Petitioners should instead be

immediately released to the custody of their father, Jose C.,[1] who lives nearby in Maryland and

---

[1] Jose C. is the biological father to Petitioner J.S.C.C. and the stepfather to Petitioners A.C.H.C.
and B.B.H.C. Petitioners A.C.H.C. and B.B.H.C.'s biological father was murdered when they were

has already completed the necessary paperwork and background checks that Respondents have requested.

2.      The Due Process Clause of the Fifth Amendment to the Constitution, a binding consent decree known as the *Flores* Settlement Agreement, and a host of interacting statutes and regulations require certain protections for unaccompanied immigrant children such as Petitioners. Children represent a particularly vulnerable population who lack the capability and resources to navigate a byzantine immigration system and asylum process that confuses even adults. Critically, these legal protections prioritize family reunification and placement of children with their parents when possible. These legal safeguards are even more important for unaccompanied immigrant children like Petitioners, who have survived violence and trauma not only in their home country, but also in Mexico under the federal government's recently adopted Migrant Protection Protocols ("MPP"), which force asylum seekers to remain in Mexico while pursuing their asylum claims in immigration court. Respondents, however, have not afforded these protections to Petitioners.

3.      For example, although their father now lives in Maryland and has completed all the paperwork and background checks Respondents have required to have Petitioners released into his custody, ORR continues to detain Petitioners in violation of both the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and the *Flores* Settlement Agreement, which together require the government to place the Petitioners in "the least restrictive setting appropriate to their age and special needs," including release "without unnecessary delay" to a parent, such as their father.

---

young children; because they were raised by Jose. C. and consider him their father, this Petitions refers to Jose C. as Petitioners' father. A Motion for Leave to File Using Pseudonyms to allow Petitioners, their mother, and their father and next friend, Jose C., to proceed under pseudonym is filed contemporaneously with this Petition.

4.     The continued threat of immediate removal by the Department of Homeland Security ("DHS") likewise violates the TVPRA, which provides protections to immigrant children by requiring, *inter alia*, that whenever DHS seeks to remove any unaccompanied immigrant child, that child "*shall* be placed in removal proceedings under section 240 of the Immigration and Nationality Act (8 U.S.C. § 1229a)" before the child can be removed. Despite this express statutory dictate, no such proceedings have been instituted with respect to Petitioners.

5.     Petitioners have survived violence and death threats. They have witnessed their mother being beaten, and their relatives have been murdered for refusing to provide information to the MS-13 gang about their whereabouts. When Petitioners sought asylum in the United States, MPP forced them into Mexico, where they were physically and sexually assaulted and endured malnutrition, illness, and the harsh elements of nature while living in a donated tent. Facing these constant dangers in Mexico, their mother, Ms. C., was met with an untenable decision: continue to risk kidnapping, death and rape in Mexico alone or with her children. The only choice Ms. C had left was to focus on her children's safety, keep them safe from MS-13 violence, and allow them to cross the border on their own to seek shelter in the United States.

6.     Petitioners have endured a host of hardships without a meaningful opportunity to present their claims for asylum or to reunite with their parents. Now, the U.S. government is refusing to honor its legal commitments for the treatment of unaccompanied immigrant children and reunify the Petitioners with their father, who lives nearby, and instead seeks to remove Petitioners to El Salvador, where no parent or caregiver is available to take custody of them.

7.     Perhaps most painfully, Petitioners are presently in a residential shelter in Maryland less than 50 miles away from their loving father, who wants nothing more than to care for them in his own home. In continuing to detain Petitioners, Respondents are violating their constitutional

and statutory rights, including by denying Petitioners the protections of the TVPRA and the *Flores* Settlement Agreement, as well as statutorily mandated opportunities to seek asylum. Petitioners respectfully request that this Court grant the writ of habeas corpus and order Respondents to comply with their obligations under the Constitution, the TVPRA, the asylum and withholding laws, and the *Flores* Settlement Agreement and take any steps needed to release them promptly from government custody to live with their father.

## JURISDICTION

8.      This Court has jurisdiction over the claims alleged in this Petition pursuant to 28 U.S.C. § 1331, as they arise under the U.S. Constitution and under federal statutes, including 8 U.S.C. §§ 1231(b)(3); 1232(a)(5)(D); 1232(c)(2)(A); 5 U.S.C. § 706(2); and 29 U.S.C. § 794.

9.      The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), waives the U.S. government's sovereign immunity where, as here, federal agencies have acted in violation of the law.

10.     The Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and Rule 57 of the Federal Rules of Civil Procedure.

11.     The Court has authority to grant injunctive relief pursuant to 5 U.S.C. §§ 702 and 706, and Rule 65 of the Federal Rules of Civil Procedure.

## VENUE

12.     Venue properly lies in the District of Columbia because a substantial part of the events and omissions giving rise to this action occurred in the District. 28 U.S.C. § 1391(e)(1)(B). Respondents are headquartered in Washington, D.C., and on information and belief, Respondents' decisions regarding the policies and procedures relating to the detention of unaccompanied immigrant children who were previously subject to MPP, also known as the "Remain in Mexico" Program, have been and are being made in the District of Columbia.

13.     Venue properly lies in the District of Columbia because the *Flores* Settlement Agreement protects Petitioners as class members who are currently being held in the legal custody of the United States Department of Health and Human Services, Office of Refugee Resettlement at the Bethany Christian Services shelter in Crofton, Maryland. The *Flores* Settlement Agreement provides that *any* child in immigration detention "may seek judicial review in any United States District Court with jurisdiction and venue over the matter" to challenge her placement by [ORR] and the conditions of her placement." Stipulated Settlement Agreement, *Flores v. Sessions*, No. cv-85-4544-RJK (Px) (C.D. Cal. Jan. 17, 1997), ¶ 24(B); *see also E.O.H.C. v. Secretary U.S. Dep't of Homeland Sec.*, 950 F.3d 177 (3d Cir. 2020) (holding that there is federal-question jurisdiction over claims brought under the *Flores* Settlement Agreement and that there is no general jurisdictional bar to another district court taking part in enforcing a consent decree when one party sues to enforce its terms).

## PARTIES

14.     Petitioner A.C.H.C. is a 16-year-old girl from El Salvador who is filing this petition by and through her next friend and stepfather, Jose C.

15.     Petitioner B.B.H.C. is a 14-year-old girl from El Salvador who is filing this petition by and through her next friend and stepfather, Jose C.

16.     Petitioner J.S.C.C. is a nine-year-old boy from El Salvador who is filing this petition by and through his next friend and biological father, Jose C.

17.     Respondent William P. Barr is the Attorney General of the United States and has responsibility for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office of Immigration Review, and is empowered to grant relief from removal. He is sued in his official capacity.

18.     Respondent Executive Office for Immigration Review ("EOIR") is responsible for adjudicating immigration cases and, under delegated authority from the Attorney General, conducting immigration court proceedings, appellate reviews, and administrative hearings.

19.     Respondent James McHenry is the Director of EOIR and oversees the nation's immigration court system. He is sued in his official capacity.

20.     Respondent U.S. Department of Homeland Security ("DHS") has responsibility for enforcing the immigration laws of the United States.

21.     Respondent Chad F. Wolf is the Secretary of DHS and directs each of the component agencies within DHS, including Immigration and Customs Enforcement. Defendant Wolf is responsible for implementing and enforcing U.S. immigration laws and policies, including orders of removal. He is sued in his official capacity.

22.     Respondent Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS that is responsible for the detention and removal operations of DHS.

23.     Respondent Francisco Madrigal is the Acting Field Office Director for the ICE Baltimore Office of Enforcement and Removal Operations and is responsible for and has authority over the removal of noncitizens within his jurisdiction, including Petitioners.

24.     Respondent Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE, and he directs the nation's immigration detention system and oversees the removal of individuals and families who are detained at facilities in the United States. He is sued in his official capacity.

25.     Respondent U.S. Citizenship and Immigration Services ("USCIS") is the sub-agency of DHS that, through its Asylum Officers, conducts interviews of unaccompanied children

to determine whether they have a credible fear of persecution and must be permitted to apply for asylum.

26.     Respondent Kenneth T. Cuccinelli is the Senior Official Performing the Duties of the Director of USCIS.

27.     Respondent U.S. Department of Health and Human Services ("HHS") is a department of the executive branch that is responsible for the care and custody of "unaccompanied" non-citizen immigrant children.

28.     Respondent Alex Azar is the Secretary of the Department of Health and Human Services ("HHS"), which encompasses the Administration for Children and Families ("ACF"), an office within HHS that encompasses ORR. He is a legal custodian of Petitioners and is sued in his official capacity.

29.     Respondent Office of Refugee and Resettlement ("ORR") is the component of HHS, which provides placement and care for "unaccompanied" non-citizen immigrant children and is directly responsible for Petitioners' detention.

30.     Respondent Jonathan Hayes is the Director of ORR. ORR is the government entity directly responsible for the detention of Petitioners. He is a legal custodian of Petitioners and is sued in his official capacity.

31.     Respondent Hildamaria Powell is a Federal Field Specialist ("FFS") at ORR and serves as the liaison between ORR and the facilities where minors are detained. Ms. Powell's jurisdiction includes Bethany Christian Services Maryland, an ORR-contracted facility in Crofton, Maryland, where Petitioners are detained. She is a legal custodian of Petitioners and is sued in her official capacity.

32.     Respondent Olubunmi Akinkuowo is the Executive Director of Bethany Christian Services Maryland, an ORR-contracted facility in Crofton, Maryland. Petitioners are detainees at Bethany Christian Services Maryland. She is a legal custodian of Petitioners and is sued in her official capacity.

## NOTICE REQUIRED BY THE *FLORES* SETTLEMENT

33.     On March 12, 2020, counsel for the Petitioners contacted the Office of the U.S. Attorney, Civil Division in the District of Columbia, via facsimile, and provided notice of the government Respondents' *Flores* Settlement Agreement violations with regard to Petitioners as required by Paragraph 37 of the *Flores* Settlement Agreement, copying respectively the Center for Constitutional Law, the National Center for Youth Law, the Office of the U.S. Attorney for the Central District of California, and the Office of Immigration Litigation at the Department of Justice.

## STATEMENT OF FACTS

### *OVERVIEW*

34.     After enduring persecution, death threats, and violence in El Salvador; separation from their father and sister/stepsister; hardship and deprivation during the journey from El Salvador to Mexico; assault, illness, and malnutrition in Matamoros, Mexico, where they remained for months subject to MPP; and finally, separation from their mother, Petitioners—three siblings from El Salvador who are 16, 14, and 9 years old—are in ORR custody with a removal order hanging over their heads.

35.     An Immigration Judge presiding over MPP proceedings issued this removal order against Petitioners and their mother on January 7, 2020, despite declining to ask any of the Petitioners a single question and failing to elicit any information about Petitioners, their fears of being returned to Mexico, and their fears of being removed to their home country of El Salvador,

which they had fled because of threats of death and violence against themselves, their parents, and their extended family members based on their kinship ties and religion.

36.     The removal order was temporarily stayed on March 12, 2020 by the Harlingen, Texas Immigration Court, to give DHS "adequate time to file a response" to Petitioners' motions reopen their immigration case and to change venue from Harlingen Immigration Court to Baltimore Immigration Court. Petitioners filed these motions on March 9, 2020, after their immigration attorneys learned on March 4, 2020, that DHS intended to execute the removal order against Petitioners on Monday, March 16, 2020.

37.     Although the removal order has been stayed for the moment, it can be executed against Petitioners at any time if the stay lifts—a fact confirmed by DHS's expressed intent to remove Petitioners before the Harlingen Immigration Court issued its stay.

38.     This threat of immediate removal, with no opportunity for Petitioners to explain why they should not be sent back to their home country, directly violates the TVPRA, which states that whenever DHS seeks to remove any unaccompanied immigrant child, that child "*shall* be placed in removal proceedings under section 240 of the Immigration and Nationality Act (8 U.S.C. 1229a)" before the child can be removed. 8 U.S.C. § 1232(a)(5)(D) (emphasis added). No such proceedings have been commenced against these three children.

39.     If executed, the removal order would return Petitioners to a country where there is no caretaker or guardian to take custody of them, and where their entire family has been threatened with death and physical violence by the MS-13 gang because of their family's religious beliefs and activities. MS-13 had already brutally murdered A.C.H.C.'s and B.B.H.C.'s biological father when they were still young children.

40.     As unaccompanied immigrant children, Petitioners are entitled to numerous protections intended to prevent such an unconscionable outcome. Petitioners, for example, are entitled to full, formal removal proceedings under Section 240 of the Immigration and Nationality Act ("INA"). As part of that process, they are entitled to present their asylum claims to a USCIS Asylum Officer in a non-adversarial setting. If the Asylum Officer does not approve their asylum claims then, they are entitled to a second opportunity to present their asylum claims to an Immigration Judge, who will review the Asylum Officer's findings and consider additional evidence and arguments showing why they are entitled to asylum. During these proceedings, they also are entitled to be placed in the least restrictive setting appropriate to their age and special needs, which includes release "without unnecessary delay" to a parent, such as Petitioners' father, who lives in Maryland and is ready to reunite with them and pursue an asylum claim for his entire family. Yet, to date, these three children have received none of these required protections.

41.     In every respect, ORR's treatment of Petitioners has failed to comply with the TVPRA, the *Flores* Settlement Agreement, the asylum and withholding laws, and the Constitution. The threat of deportation hanging over Petitioners is just the most recent in a string of examples of how MPP and ORR's treatment of unaccompanied immigrant children continues to violate the law and Petitioners' statutory and constitutional rights. Petitioners have been victimized by an immigration system that has turned a deaf ear to the asylum claims and very credible fears of persecution of young, unaccompanied immigrant children like Petitioners, subjecting them to violence and fear in Mexico in addition to their home country of El Salvador.

## *LEGAL BACKGROUND*

### Asylum Procedures at the U.S.-Mexico Border Before MPP

42.     Until recently, individuals applying for asylum at the U.S.-Mexico border were placed either in expedited removal proceedings under INA § 235(b)(1), 8 U.S.C. § 1225(b)(1), or in full removal proceedings under INA § 240, 8 U.S.C. § 1229a.

43.     Expedited removal allows the immediate removal, without a hearing before an Immigration Judge, of noncitizens who lack valid entry documents or attempt to enter the United States through fraud—*unless* they express a fear of persecution. *See* 8 U.S.C. § 1225(b)(1)(A)(i). Asylum seekers who were placed in expedited removal would receive a credible fear interview with an Asylum Officer. If they passed that interview—by showing a significant possibility that they would be able to establish eligibility for asylum, 8 U.S.C. § 1225(b)(1)(B)(v), a low threshold—they were required to be placed in regular removal proceedings under INA § 240, which begin when DHS issues and files with the immigration court a charging document called a Notice to Appear ("NTA"). 8 C.F.R. § 1239.1(a).

44.     Until significant recent procedural changes, asylum seekers could pursue their asylum claims during the removal process while remaining in the United States, regardless of whether they were placed in regular removal proceedings after passing a credible fear interview, or placed directly in regular removal proceedings. Asylum seekers would either be held in detention or released pursuant to parole or bond pending completion of their asylum and removal proceedings.

45.     Whether detained or released, however, no asylum seeker could be physically removed from the United States without an order of removal duly issued by an Immigration Judge either in full removal proceedings or, for those who failed to pass a credible fear screening, in expedited removal proceedings.

**The Migrant Protection Protocols**

46.     On December 20, 2018, then-DHS Secretary Nielsen announced a new policy for processing asylum seekers at the southern border: the Migrant Protection Protocols ("MPP"), often referred to as the "Remain in Mexico" program. Under MPP, individuals who arrive at the southern border and request asylum—either at a port of entry or after crossing the border between ports of entry—receive Notices to Appear in immigration court and are promptly returned to Mexico, where they must remain for the duration of their immigration proceedings, instead of pursuing these proceedings in the United States. They are instructed to return to a specific port of entry at a specific date and time for their next court hearing. While these asylum seekers remain in Mexico, the U.S. does not provide them with food, shelter, work, funds, or transportation to and from their U.S. court hearings, or access to legal counsel.

47.     The Trump administration subsequently issued several memoranda and guidance documents in late January 2019 to implement MPP. These directives included a January 25, 2019 memo from then-DHS Secretary Nielsen, stating that MPP would be implemented "on a large scale basis;" a memorandum issued a few days later by then-Customs and Border Patrol ("CBP") Commissioner Kevin McAleenan, announcing that the CBP would begin implementing MPP at the San Ysidro Port of Entry in California on January 28, 2019, with expansion to other ports of entry "in the near future;" and a Policy Guidance issued by USCIS on January 28, 2019. CBP began enforcing MPP at the San Ysidro Port of Entry on January 28, 2019; it subsequently expanded into Texas in stages throughout 2019 and to Arizona in January 2020.

48.     Under the administration's implementing documents, certain groups, including unaccompanied children, are exempt from MPP. For others, the decision to send a person or family back to Mexico under MPP rests entirely with individual CBP officers or Border Patrol agents. Individuals who cross the border at the same time may be treated differently, with one person sent

back under MPP and another permitted to seek asylum through the normal process. In some situations, families have been separated at the border, with one parent sent back to Mexico and the other parent and child or children allowed to enter the United States. To date, approximately 60,000 individuals—the vast majority of asylum seekers presenting themselves at the southern border— have been sent back to await their asylum proceedings in Mexico under MPP.

49.     Asylum proceedings in MPP are far different than normal asylum proceedings that occur in the United States. Most notably, the Trump administration has set up large tent facilities at certain ports of entry. These tents function as "virtual immigration courtrooms" where hearings for asylum seekers subject to MPP are conducted by Immigration Judges appearing remotely by videoconference. Petitioners and their mother went through one such hearing.

50.     Unlike immigration proceedings in the United States, the so-called "tent courts" were completely closed to the public when they began operating in September 2019, even though DOJ regulations require public access to immigration hearings. Although EOIR made the tent courts nominally open to the public in January 2020, journalists and attorneys have reported limitations on their ability to watch hearings, take notes, and meet with clients. Asylum seekers in the tent courts, moreover, do not receive the usual Legal Orientation Program benefits that other migrants in immigration detention facilities, or who are released on their own recognizance, receive in the United States.  These benefits include group orientations, one-on-one meetings, workshops, and referrals to free or low-cost legal services.

51.     Asylum seekers who are allowed to wait in the United States as their asylum cases progress are also *seven times* more likely to find an attorney to represent them than are those required to remain in Mexico under MPP. This is due in large part to the fact that U.S.-based attorneys familiar with U.S. immigration law face severe logistical challenges meeting clients in

Mexico. According to an independent analysis of data obtained from EOIR under the U.S. Department of Justice, less than 5% of asylum seekers in MPP have an attorney. In comparison, 32% of asylum seekers who are allowed to remain in the United States are able to obtain an attorney. Given that asylum seekers also are *five times* more likely to obtain asylum when represented—a figure that increases more than *fourteen times* specifically for women and children—the challenges involved in obtaining representation in MPP are outcome-determinative, leaving meritorious asylum unheard or ungranted.

52.     But even if MPP asylum seekers are lucky enough to find an attorney to assist and represent them, there is no safe place on the Mexican side of the border for an attorney to speak with clients and prepare their cases; the lack of such a facility places significant handicaps on the asylum seekers' claims. DHS, moreover, severely curtails the amount of meeting time between attorneys and clients before hearings—sometimes to as little as 15 minutes—thereby undermining attorneys' ability to conduct the fact-finding, diligence, and preparation necessary to present the strongest case for their clients.

53.     Having to remain in Mexico under MPP, moreover, significantly impairs asylum seekers' ability to attend their court hearings. While nine out of ten immigrants who are allowed to remain in the United States attend all their court hearings, at least 50% of MPP asylum seekers fail to appear for a hearing, leading to Immigration Judges closing their cases with an *in absentia* removal order.

54.     *In absentia* removal orders are all too common because asylum seekers in MPP face kidnapping, rape, and other forms of violence along the border. Many, moreover, have no permanent address, which means that there is no way for the Immigration Courts to notify them of the date, time, and location of their hearing. And notices that do reach asylum seekers may not

have accurate or complete information about their hearing or about where and how to cross the border into the U.S. to attend their hearings.

### The Impacts of MPP

55.     MPP has now been in effect for over a year and during that time approximately 60,000 people, including 16,000 children and nearly 500 infants under the age of one, have been sent back to Mexico to await court hearings. Conditions at the border have become dire for asylum seekers waiting in Mexico. Under MPP, asylum cases take even longer to adjudicate than cases that proceed in the United States. Most individuals must spend many months waiting to have their asylum cases decided while living in squalid conditions, in some of the most dangerous areas in Mexico where they face discrimination, sexual exploitation and assault, and targeting because of their nationality, gender, and sexual orientation, among other reasons. *See, e.g.*, *Lawyer defending Trump policy makes stunning admission*, CNN (Mar. 11, 2020), https://www.cnn.com/videos/politics/2020/03/11/valencia-migrant-kidnapped-awaiting-asylum-hearing-pkg-lead-vpx.cnn (describing conditions at a border camp in Reynosa, Tamaulipas, Mexico).

56.     For example, asylum seekers sent to the Laredo or Brownsville courts, like Petitioners, must reside in or pass through the Mexican state of Tamaulipas, which the State Department has designated as a "no travel zone" for U.S. citizens and classifies at the *same danger level* as Syria, Afghanistan, and Yemen—all countries with active war zones. Human Rights First reports that as of February 28, 2020, there have been at least 1,001 publicly reported cases of murder, rape, torture, kidnapping, and other violent assaults against asylum seekers and migrants forced to return to Mexico. Victims include 228 children returned to Mexico who were kidnapped or nearly kidnapped.

57.     Some asylum seekers returned to Mexico are lucky to find housing in shelters, hotels, or rooms for rent. Many have no choice but to make do with tents and tarps in encampments that have sprung up around the bridges linked to U.S. ports of entry along the Rio Grande. Asylum seekers in these camps live without basic necessities like clean drinking water, public toilets, and warm clothes. They face heightened risks of extortion, kidnapping, torture, and rape at the hands of cartels and other criminals. At the camp in Matamoros, children under five make up one-quarter of the 2,500 asylum seekers who live in tents by the port of entry; these children have suffered near-freezing temperatures, sexual and physical assaults, malnutrition, and a range of other life-threatening conditions.

### Family Separations Under MPP

58.     MPP has returned families with minor children, including very young ones, to conditions in Mexico that are dangerous and life-threatening. In recent months, attorneys serving unaccompanied children in the United States have reported that more children are arriving without parents or legal guardians after spending time in life-threatening conditions with a parent or guardian in MPP. According to HHS figures, between October 1, 2019 and January 13, 2020, 352 children have crossed the U.S. border without their parents or legal guardians after spending time in Mexico in MPP. *See* Priscilla Alvarez, *At least 350 children of migrant families forced to remain in Mexico have crossed over alone to US*, CNN (Jan. 24, 2020), https://www.cnn.com/2020/01/24/politics/migrant-children-remain-in-mexico/index.html. Attorneys and advocates for unaccompanied children in the United States report that this figure has steadily increased in the months since January 2020. These trends suggest that parents with children sent back under MPP to dangerous conditions in Mexico are making the wrenching decision to face these dangers alone rather than with their children, and to separate in order to ensure the physical safety of their children.

59.     These MPP family separations are not only causing pain and severe trauma; they are also artificially undermining the families' legitimate claims of asylum. For example, when the parent suffered the persecution or abuse that caused the family to flee their home country, but the children are in the United States facing immigration court proceedings separately, it is difficult for the children to present a compelling case for asylum. Likewise, when a child (such as a teenager) was the target of gang violence and threats and is now in the U.S. alone, separated from her parents in Mexico, her parents' asylum claim often falters due to the separation, not the claim's underlying merits.

### Legal Framework and Policies Governing Treatment of Unaccompanied Immigrant Children

60.     Children who separate from their families under MPP and present themselves at the border alone are apprehended by CBP, transferred to the custody of ORR, and designated as "unaccompanied alien children" ("UACs"). "UACs" are statutorily defined as children under the age of 18 with no lawful immigration status and no parent or legal guardian in the United States to provide care and physical custody. 6 U.S.C. § 279(g)(2). The classification attaches when the child first comes into government custody and remains with the child even if the child is eventually released to the custody of a parent, relative, or other caregiver. ORR is responsible for the custody and care of unaccompanied immigrant children while they await the outcome of their immigration proceedings. *See, e.g.*, Congressional Research Service, Unaccompanied Alien Children: An Overview (Oct. 9, 2019), https://fas.org/sgp/crs/homesec/R43599.pdf (last visited Mar. 16, 2020).

61.     Three key laws and agreements govern the federal government's treatment and custody of unaccompanied immigrant children: the *Flores* Settlement Agreement; the Homeland Security Act of 2002; and the TVPRA. Collectively, these laws and agreements favor family reunification and the release of unaccompanied immigrant children from ORR custody.

62.     The *Flores* Settlement Agreement resulted from a lawsuit filed in 1985 by a group of immigrant children challenging their detention and seeking release to family members and/or sponsors within the United States. After extensive federal litigation over both conditions of detention and the conditions of release for such children, the government entered into a consent decree in 1997, in a case presently captioned *Flores v. Sessions*, Case No. CV-85-4544 (C.D. Cal.).

63.     The *Flores* Settlement Agreement established a nationwide policy for the detention, release, and treatment of all immigrant children in government custody, whether apprehended while unaccompanied or with family members. In addition to setting certain minimum detention standards, the *Flores* Settlement Agreement guarantees that children shall be released "without unnecessary delay." It further guarantees release to an adult caregiver, with parents and other family members given priority; requires the government to place each detained minor in "the least restrictive setting appropriate to the minor's age and special needs;" and requires the government to undertake "prompt and continuous efforts" to effect family reunification. *Flores* Settlement Agreement ¶¶ 11, 14, 18. These requirements reflect the fact that many unaccompanied immigrant children have parents or other relatives present in the United States and that rapid reunification with these family members is in the children's best interest.

64.     In 2002, Congress took further action to protect immigrant children when it passed the Homeland Security Act ("HSA"). This statute transferred the care and custody of unaccompanied immigrant children from the Immigration and Nationality Service to ORR, an agency within HHS. Pub. L. 107-296, 116 Stat. 2153 (Nov. 26, 2002). ORR is not a security or enforcement agency; rather, its mission is to "incorporat[e] child welfare values" into the care and placement of unaccompanied children. *Unaccompanied Alien Children*, Office of Refugee Resettlement, https://www.acf.hhs.gov/orr/programs/ucs (last visited March 16, 2020).

65.     Section 462 of the HSA extended the key terms of the *Flores* Settlement Agreement, including its "least restrictive setting" requirement, to all unaccompanied immigrant children. Pub. L. 107-296, 116 Stat. 2153 (Nov. 26, 2002).

66.     In 2008, Congress further strengthened protections for unaccompanied immigrant children through the TVPRA. *See* Pub. L. 110-457, 122 Stat. 5044 (Dec. 23, 2008). Like the *Flores* Settlement Agreement, the TVPRA mandates that an unaccompanied child "shall be promptly placed in the least restrictive setting that is in the best interest of the child." *Id.* Senator Diane Feinstein, a sponsor of the bill that would become the TVPRA, explained that the legislation was intended to redress situations like one she had personally witnessed, where an unaccompanied immigrant child remained in custody for nine months after her initial detention. The text and legislative history of the TVPRA make clear that Congress enacted the law to facilitate the prompt release and minimally restrictive placement of immigrant children.

67.     Under the TVPRA, ORR endeavors to place each unaccompanied immigrant child with a suitable sponsor, such as a parent or family member. A sponsor is suitable if he or she is "capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A).

68.     The TVPRA also requires that children be screened within 48 hours of being apprehended to determine whether they have a credible fear of returning home. 8 U.S.C. § 1232(a)(4).

69.     In addition, although typically only the immigration court has jurisdiction over an asylum application filed by an individual in removal proceedings, the TVPRA provides that USCIS has initial jurisdiction over an unaccompanied immigrant child's asylum application. This is the mandate even if the child has since reunited with a parent or legal guardian, has pending claims in immigration court or the Board of Immigration Appeals, and/or is in removal proceedings

under INA § 240. 8 U.S.C. § 1158(b)(3)(c); *see also* Congressional Research Service, Asylum Policies for Unaccompanied Children Compared with Expedited Removal Policies for Unauthorized Adults: In Brief (July 30, 2014), https://fas.org/sgp/crs/homesec/R43664.pdf (last visited Mar. 16, 2020).

70.     The USCIS asylum process for unaccompanied immigrant children is less adversarial than immigration court and it seeks to be more sensitive to the special needs of children who cannot be expected to know how to navigate the complexities of an immigration system designed for adults. For example, in USCIS asylum proceedings, unaccompanied immigrant children are not cross-examined in a courtroom by government attorneys; instead, they engage with USCIS Asylum Officers trained to apply child-sensitive and trauma-informed interview techniques and to conduct non-adversarial interviews that take into account the child's age, stage of language development, and background. Although it does not guarantee a right to counsel without expense, the TVPRA directs USCIS to help make *pro bono* counsel available to these children. 8 U.S.C. § 1232(c)(5). And while asylum applicants generally must file their asylum applications within one year of entering the United States, *see* 8 U.S.C. § 1158(a)(2)(B), the TVPRA exempts unaccompanied immigrant children from this deadline. 8 U.S.C. § 1158(a)(2)(E).

71.     Even if a USCIS Asylum Officer decides that an unaccompanied immigrant child in removal proceedings is not eligible for asylum, that child may nevertheless present her asylum claim in immigration court removal proceedings. The TVPRA requires that all unaccompanied children, except those from contiguous countries who agree to voluntary return, receive the full and formal removal proceedings afforded under INA § 240, 8 U.S.C. § 1229a. *See* 8 U.S.C. § 1232(a)(5)(D)(1). Accordingly, all unaccompanied immigrant children from countries, except those whose home countries are Mexico and Canada cannot be subject to expedited removal;

reinstatement of prior removal orders; or the enforcement of an existing removal order, because they are entitled to formal removal proceedings before an Immigration Judge before they can be removed.

72.     Such full removal proceedings under INA § 240 must be initiated by the filing of a Notice to Appear ("NTA"). *See* 8 C.F.R. § 1239.1 ("[E]very removal proceeding conducted under section 240 of the Act (8 U.S.C. § 1229a) to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the immigration court."). During Section 240 removal proceedings, the Immigration Judge will review the Asylum Officer's findings and will accept additional evidence and argument as to why asylum is warranted. Unaccompanied immigrant children, moreover, are entitled to pursue any forms of immigration relief for which they might qualify, including asylum, Special Immigrant Juvenile Status, relief under the Violence Against Women Act, and family-based options. EOIR, moreover, has adopted special guidance governing how Immigration Judges should conduct hearings involving unaccompanied immigrant children, including establishing an "age-appropriate" hearing environment. EOIR, Operating Policies and Procedures Memorandum 07-01, Guidelines for Immigration Court Cases Involving Unaccompanied Alien Children, at 3 (Dec. 20, 2017), https://www.justice.gov/eoir/file/oppm17-03/download (last visited Mar. 16, 2020).

73.     Unaccompanied immigrant children are therefore entitled to seek asylum and other relief from removal at least twice as they move through full removal proceedings under INA § 240: first, in a non-adversarial interview with a USCIS Asylum Officer; and second, through their formal, statutory EOIR removal proceedings, in a hearing before an Immigration Judge. These protections reflect the special circumstances of unaccompanied immigrant children, many of whom have experienced violence and trauma, and who require accommodations not afforded to

adults in order to navigate the U.S. immigration system and have a legitimate opportunity to present their asylum claims.

## PETITIONERS' BACKGROUND

74.     Petitioners A.C.H.C.—a 16-year-old girl; B.B.H.C—a 14-year-old girl, and J.S.C.C.—a 9-year-old boy, are siblings from El Salvador. Petitioners share the same mother, Ms. C.; her husband, Jose C., is the stepfather of A.C.H.C. and B.B.H.C., and the father of J.S.C.C. and one other daughter with Ms. C. When they were young children, A.C.H.C. and B.B.H.C.'s biological father was murdered by MS-13; their mother married Jose C. when A.C.H.C. was six and B.B.H.C. was four, and the two girls consider him their father. Petitioners also have two older sisters/stepsisters.

75.     Jose C., Ms. C., Petitioners, and their siblings resided in a small town within Usulután, El Salvador. The family was very active in their local church and would frequently evangelize to the community, offer food and clothing to those in need, and organize public church events to spread the word of God. Jose C. was the director of the church's youth outreach program; his wife was the director of the church's elder ministry. Their children were always part of their parents' religious activities and accompanied them whenever they evangelized.

76.     The family's religious work made them a target of MS-13 criminal activity, as the gang often singles out churches and charity groups with religious affiliations. In a 2018 report on religious freedom in El Salvador, for example, the State Department referenced reports that gangs expelled or denied access to church leaders in their communities, extorted a "tax" to allow churches to operate in specific geographic territories, and demanded that churches divert charitable items to the families of gang members. U.S. Dep't of State, *El Salvador 2018 International Religious Freedom Report* (2018), https://www.state.gov/wp-content/uploads/2019/05/EL-SALVADOR-

2018-INTERNATIONAL-RELIGIOUS-FREEDOM-REPORT.pdf.   The *New York Times* has identified MS-13 specifically as "the largest of the ruthless gangs that have made El Salvador the murder capital of the world," and gang violence is commonplace in Petitioners' hometown. *See* Óscar Martínez, et al., *Killers on a Shoestring: Inside the Gangs of El Salvador*, NYTimes (Nov. 20, 2016), https://www.nytimes.com/2016/11/21/world/americas/el-salvador-drugs-gang-ms-13.html; *see also One Day in Usulután: Gangs of El Salvador (Part 3)*, YouTube (Nov. 25, 2015), https://www.youtube.com/watch?v=2SNjnk6AmKY (one of a five-part series on the gangs of El Salvador produced by VICE News in 2015, this part devoted entirely to gang violence in Usulután). Jose C. also personally witnessed gangs in his hometown work in conjunction with the police, making it impossible to request or receive from governmental authorities any protection from the gangs.

### Death Threats, Violence, and Persecution in El Salvador

77.     MS-13 gang members frequently threatened Petitioners' family because of their religious activities. In 2013, gang members threatened to beat Jose C. 13 times with a belt buckle if he continued evangelizing but only three times if he stopped. Jose C. agreed to stop evangelizing and received three lashes, but continued his religious work in secret. Gang members also pressured Jose C. to transport arms or drugs for them, but he always refused.

78.     MS-13 also began threatening and extorting Ms. C. that same year. Gang members passed by her tortilla stand every day, demanding that she pay a daily tax of tortillas and cash. When Ms. C. refused to give the gang members money, they reminded her that MS-13 gang members left her first husband "cut up in a field," referring to the fact that they had slashed him to death with machetes.

79.     The family's problems intensified in April 2014 based on a series of events that led to MS-13 gang members suspecting that Jose C. was collaborating with police.

80.     After MS-13 had attempted to assassinate a police officer and church acquaintance of Jose C., the former police officer abandoned his home and fled the community. When he did so, he offered to let Ms. C. store her tortilla equipment in the abandoned house because it was much closer than her own home to the place where Ms. C. sold her tortillas, and she would not have to transport the equipment so far every day.

81.     About two weeks later, the church acquaintance called Jose C. and asked him to retrieve a few items from the garden at the abandoned house, which he did. A neighbor overheard this phone conversation and, because the church acquaintance was a former police officer, reported to the gang that Jose C. was collaborating with the police. Gang members interrogated Jose C. that same night. When Jose C. tried to explain that he had only been talking to the church acquaintance and former police officer about using the abandoned house, the gang ordered Jose C. to vacate the house immediately. Later that night, as instructed, he removed all the family's belongings from the house and fled.

82.     The next night, MS-13 demolished the church acquaintance's house. But because Jose C. had removed the family's belongings the day before, the church acquaintance suspected that Jose C. had received advance notice and accused him of collaborating with the gang. When the local police investigated the demolition of the home, they detained and beat Jose C.'s nephew because they suspected he had been involved.

83.     For three days after the demolition, Jose C. and his eldest daughter from a prior marriage hid themselves in a bathroom because they had heard from a friend that the gang was

planning to kill him. They then fled to Chiapas, Mexico, with the plan of later bringing the rest of the family members.

### Attempted Relocation for Petitioners and Their Family in Mexico Ends in Deportation to El Salvador

84.     In Mexico, Jose C. made arrangements to present himself to Mexican officials to seek asylum, but before he could attend the necessary appointment, he received a call from his wife, who said she had received death threats against their children from the gangs and had fled their hometown in El Salvador. After Jose C.'s departure, armed MS-13 gang members had threatened Ms. C., telling her that they would kill her children if she did not inform the gang of Jose C.'s location.

85.     When Jose C. spoke with his wife, she was crying and distraught and already near the Mexico-Guatemala border with their children. He immediately left to find them, missing his asylum appointment, because he knew that once they crossed the border, their cell phone would not work and he would lose contact with his family.

86.     The family reunited and lived together in Mapastepec, Chiapas, Mexico, near the Southern border of Mexico, for two years. Jose C. worked for a moving company; Ms. C. worked in a restaurant. Their family was building a life together there, but then Ms. C. was arrested by immigration authorities in 2016. She and the children were deported the following day back to El Salvador. Afraid that his family would again be subjected to further persecution, Jose C. voluntarily returned to El Salvador with his family in an effort to protect them.

### A Return to Death Threats and Persecution in El Salvador

87.     The family knew they could not return to their hometown in Usulután because of the gang threats. To avoid MS-13, the family moved constantly to different areas of El Salvador from 2016 to the summer of 2019: first to El Congo, then Puerto El Triunfo, then Cocosica, and

then San Felipe. But in each location, someone from their original hometown would always recognize them. Because of MS-13's extended network of informants, the family became fearful every time they were recognized. Moving around frequently was extremely difficult; the children could never to complete a school year in one place, and the family lived in constant fear of the gang. Indeed, J.S.C.C., now 9, never learned to read and can barely write.

88.     These fears were only confirmed in 2017; while the family was living in El Congo, Ms. C.'s brother assaulted her when she traveled to El Transito to buy supplies for her tortilla stand. Without warning, her brother viciously beat her in front of J.S.C.C. and threatened to kill her.

89.     The attack was so brutal that Ms. Ms. C.'s bone was visible through her skin and she was unable to work for over two weeks due to the extent of her injuries, which prevented her from sitting without the wounds on her knees opening. Petitioner J.S.C.C. was traumatized by the event and frequently woke up with nightmares, screaming, "Leave my mother alone!" Although they family suspects the attack occurred because the stepson of Ms. C.'s brother was an MS-13 gang member, they were too afraid to tell the police exactly what happened. The police often collaborate with, or are sometimes even members of, the gangs, and the family feared retribution.

90.     Their fears only grew when, in 2017, one of Jose C.'s nephews called and said that gang members had asked where they could find Jose C. and his family.  Shortly after Jose C.'s nephew refused to divulge the family's location, he was murdered by MS-13 gang members. Two of Jose C.'s other nephews were also murdered by MS-13.  The family fears that these deaths are related to the gang's attempts to find Jose C., and are heartbroken and traumatized that the gang has begun targeting their extended relatives.

91.     Finally, in early June 2019, when the family was residing in San Felipe, a young man recognized Ms. C. at her tortilla stand, identifying her as the same woman who had sold tortillas in their hometown. This man's brothers were the very same gang members who had threatened Ms. C. years ago in their hometown.

### Fleeing to the United States

92.     After Ms. C. had been recognized yet again in San Felipe, the family realized they would never be safe anywhere in El Salvador. Avoiding their hometown, they had already moved four times and had been recognized each time; Ms. C. had been brutally beaten and warned she would be killed; and the gang was threatening, and even murdering, their family members in an effort to seek information about the family's whereabouts.

93.     The family did not have enough money, however, to flee together. Jose C. and his second oldest daughter fled to the United States first, in June 2019, while Ms. C. took the other children to stay with Jose C.'s uncle for a short period of time before fleeing El Salvador yet again. The family planned to reunite in the safety of the United States.

94.     Jose C. and his daughter entered the United States in June 2019 at Laredo, Texas. After their apprehension by immigration officers, Jose C. and his daughter were released on their own recognizance and now reside in Maryland, where Jose C. is awaiting a hearing in Baltimore Immigration Court and plans to apply for asylum for himself and his family.

95.     Ms. C. and Petitioners left El Salvador two months later, in or around August 2019, traveling through Guatemala and Mexico. In Mexico, a guide led them from house to house, from one town to another, with other migrants. At one of these houses, a group of armed men broke in, pointed guns at the occupants, threatened to call Mexican immigration authorities, and took the occupants' cell phones and money, threatening to kidnap two minors if the migrants did not hand

over all they had. The men then kidnapped the guide, who returned later that night after being severely beaten.

96.     Petitioners and their mother finally entered the United States on or around September 13, 2019, when they were apprehended by immigration officers and detained in an extremely cold border patrol detention facility, or *hielera* (icebox/freezer), for several days. Their delayed departure after Jose C. had fateful consequences: by that time, implementation of MPP had expanded to South Texas, and an immigration officer informed Ms. C. that she and Petitioners could not stay in the United States and would be forced to return to Mexico. During their entire time in CBP custody, no immigration officials ever addressed Petitioners or asked them about their fears of returning to Mexico. Petitioners and their mother were processed through MPP, given Notices to Appear in immigration court on December 16, 2019, and placed on buses to Matamoros, Mexico, to await their immigration hearings approximately two months later.

### Petitioners' Hardship and Trauma in MPP

97.     In Matamoros, Ms. C. and Petitioners were processed by Mexican authorities. Although they were told that they would be taken to a shelter, they were instead taken to a camp packed with other MPP asylum seekers.

98.     Forced to wait in Matamoros for months until their immigration hearing, Petitioners and their mother lived by the river in a tent they received from a local church. They endured intense heat during the days, then freezing nights as the winter approached. They survived on what they could buy with the limited money Jose C. sent them and whatever Ms. C. earned when she could sell tortillas. Sometimes the money ran out and they did not have enough food. On one occasion, a grown man assaulted and robbed J.S.C.C., beating him on the head and stealing the little money he was taking to buy food.

99.     Petitioners' mother subsequently got sick with a high fever and a bad cold; then the entire family contracted chicken pox in October. Rather than providing medical care, Mexican officials evicted Petitioners and their mother from the camp and sent them to a shelter where other individuals were using drugs and behaving erratically. Petitioners and their mother were only able to leave the shelter after a local friend came to rescue them. A.C.H.C. recalls "being sick for a long time."

100.    Kidnappings and crimes against individuals in the camp were frequent. Petitioners witnessed women and children being kidnapped by the *Zetas* gang. The family knew a woman who was kidnapped as soon as she exited a taxi. They encountered a corpse floating in the river where they bathed. At the camp, a man sexually assaulted Petitioner A.C.H.C., grabbing her from behind and attempting to rape her. Ms. C. reported the crime to Mexican authorities, but the perpetrator convinced the police that he was innocent, and the police declined to act. A.C.H.C. and her sister recall being scared every day.

## Petitioners' MPP Immigration Proceedings

101.    Finally, on December 16, 2019, Petitioners and their mother went to the bridge to cross into the United States for their first court hearing in Brownsville, Texas. The courtroom was crowded and A.C.H.C. recalls that it was filled with many chairs, one table, and one TV, on which the Immigration Judge appeared by video to preside over the hearing.

102.    During Ms. C. and Petitioners' first hearing, the Immigration Judge questioned only Ms. C., who had no counsel and went to the table and sat down at a chair to speak. The judge did not speak to or even appear to acknowledge Petitioners, who remained in the back of the courtroom and could not hear the proceedings.

103.    The Immigration Judge gave Ms. C. asylum applications and instructed her to complete and return them during their next hearing, scheduled for January 7, 2020.

104.    Ms. C., who is not fluent in English and could not complete the applications by herself, paid a man to help her complete the asylum applications. She and Jose C. also worked together to assemble evidence to help support her and Petitioners' immigration cases. Ms. C. had heard from other asylum seekers in the Matamoros camp that it was important to obtain translated documents, declarations, and witnesses to support their cases. She and her husband gathered a list of signatures, with contact information and identifying information of neighbors and others, to confirm the family's story. They were able to find people willing to support the family's case, despite the danger of MS-13 and their threats.

105.    Ms. C. submitted asylum applications for herself and Petitioners when they appeared for their second hearing in Brownsville on January 7, 2020. Petitioners never saw the applications themselves, but even if they had, none of them could have known what the applications said because none of them is fluent in English. The second hearing was like the first. The Immigration Judge addressed only Ms. C., who again had no counsel. Indeed, A.C.H.C. recalls that her mother attempted to inform the Immigration Judge that she has two daughters who are 16 and 14 years old, and who would be able to speak for themselves, but the Immigration Judge refused to hear from them and said Ms. C. would speak for the entire family.

106.    Although asylum proceedings in the U.S. are normally conducted in private, Ms. C. had to testify in public in her MPP proceeding, while her children and other MPP asylum seekers looked on. During the hearing, the Immigration Judge did not ask Ms. C. or Petitioners for any information to support their asylum claim. None of the Petitioners had an opportunity to speak.

After speaking with only Ms. C. for a short time, the Immigration Judge ordered Petitioners and their mother removed.

107.    Ms. C. was then given several documents that she believed were removal orders, in addition to two notices that neither she nor Petitioners fully understood, but which seemed to concern an appeal deadline and hearing dates of February 6 and 21, 2020, respectively. The Immigration Judge informed Ms. C. that she needed a good attorney to appeal the decision, which Ms. C. understood to mean that she could not file an appeal without having an attorney.

108.    After the hearing, J.S.C.C. recalls the family leaving the courtroom and crying because they had no money, they had nothing to eat, and his mother had just lost her case.

109.    Because Ms. C. understood the Immigration Judge to have told her that she could not appeal without an attorney, she thought that she could not appeal her case and has not done so.

### Family Separation and Imminent Deportation Back to El Salvador

110.    Taking their only chance of escaping the violence in Mexico and El Salvador, Petitioners crossed the bridge into the United States and presented themselves to border officials approximately one week after the Immigration Judge had ordered them removed. Their mother remained in Mexico. Although Petitioners were designated as UACs, they were not issued new Notices to Appear—the charging document necessary to initiate a hearing in immigration court through removal proceedings—and still have not been issued such Notices that would reflect their new entry into the United States.

111.    Thereafter, DHS transferred Petitioner's custody to ORR and on January 18, 2020, Petitioners were transferred to Bethany Christian Services Maryland, an ORR facility in Crofton, Maryland, where they were placed in temporary foster care. As part of the ORR reunification process, Bethany shelter staff requested Jose C., who resides in Maryland, to submit several pieces

of paperwork and pass a required background check before they would release the children into his custody. Jose C. complied with all these requests within 10 days of Petitioner's arrival.

112.    Because of the removal order that Petitioners received with their mother through MPP, ORR halted all efforts to release Petitioners to their father/stepfather in January. Instead of reuniting with their father, Petitioners have only been able to visit with him at the shelter once a week. They are happy to see him when he arrives and cry when he leaves. During these visits, Jose C. has brought gifts for Petitioners, such as snacks, to boost their morale, but the staff at Bethany have refused to give them to Petitioners.

113.    On Wednesday, March 4, 2020, immigration counsel for Petitioners, Laura Michelle Nally, received notice that DHS intended remove Petitioners and scheduled them for deportation to El Salvador on Monday, March 16, 2020.

114.    If they are removed to El Salvador, Petitioners have no family members who are able to take custody of them and keep them safe because of the murders of multiple other relatives and the continued death threats MS-13 has made against the family.

115.    DHS has not filed a Notice to Appear to initiate and place Petitioners in removal proceedings under INA § 240, as required by the TVPRA and implementing regulations whenever DHS seeks to remove an unaccompanied immigrant child.

116.    The following Monday, March 9, 2020, Petitioners' attorney filed I-246 Applications for a Stay of Removal on behalf of all Petitioners, delivered via hand by a colleague to the ICE Enforcement and Removal Office ("ERO") office in Baltimore, Maryland, and followed up with ICE with multiple phone calls.

117.    That same day, Ms. Nally filed Emergency Motions to Reopen, Emergency Motions for Stays of Removal, and Motions to Change Venue for each Petitioner via overnight

delivery to the Harlingen Immigration Court and again, followed up with the court with multiple phone calls.[2]

118.    On March 12, 2020, Ms. Nally received an order from the Harlingen Immigration Court, granting Petitioners' motion for a stay of their removal order. The stay order allows the Court to adjudicate Petitioners' motions to reopen the removal order and to change venue from the Harlingen Immigration Court to the Baltimore Immigration Court, including "adequate time" (10 days from receipt of Petitioners' motions)[3] for DHS "to file a response to Respondents' motions."

## CAUSES OF ACTION

### COUNT ONE
### Violations of Due Process

119.    Petitioners reallege and incorporate the allegations of all the preceding paragraphs.

120.    The Due Process Clause of the Fifth Amendment applies to all "persons" on United States soil and thus applies to Petitioners.

121.    Petitioners have a liberty interest under the Due Process Clause in being free from detention and remaining together as a family with their father and mother. *D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016).

122.    The continued detention and separation of Petitioners from their father and mother violates substantive due process because it furthers no legitimate purpose, to say nothing of a compelling governmental interest.

---

[2] Petitioners filed their motions with the Harlingen Immigration Court because that court has administrative control over cases proceeding under MPP in Brownsville.

[3]    *See*   Immigration   Court   Manual   (2020),   Rules   3.1   (c)(ii)(E)   and   5.2, https://www.justice.gov/file/1250706/download.

123.     The continued detention and separation of Petitioners from their father and mother also violates procedural due process because it was undertaken without any hearing or indeed any other adequate procedural protections.

### COUNT TWO
**Violation of TVPRA, 8 U.S.C. § 1232(a)(5)(D), (c)(2)(A), and Administrative Procedure Act, 5 U.S.C. § 706(1) (Agency Action Unlawfully Withheld)**

124.     Petitioners reallege and incorporate the allegations of all the preceding paragraphs.

125.     The TVPRA sets out two discrete, nondiscretionary actions that the government must take with regard to all unaccompanied immigrant children. First, 8 U.S.C. § 1232(a)(5)(D) expressly states that when DHS seeks to remove any unaccompanied immigrant child, that child "*shall* be placed in removal proceedings under section 240 of the Immigration and Nationality Act (8 U.S.C. 1229a)." (emphasis added).

126.     Second, 8 U.S.C. § 1232(c)(2) states that "an unaccompanied alien child in the custody of the Secretary of Health and Human Services *shall* be promptly placed in the least restrictive setting that is in the best interest of the child." (emphasis added). This includes consideration of release to and reunification with parents in the United States or other relative caregivers.

127.     As explained above, Respondents have not taken, and are not taking, either of these statutorily required actions.

128.     The Court may "compel agency action unlawfully withheld or unreasonably delayed . . . ." 5 U.S.C. § 706(1). To make a showing under 5 U.S.C. § 706(1), Petitioners must demonstrate "that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted).

129.     Accordingly, Petitioners seek a court order under 5 U.S.C. § 706(1) and the TVPRA, compelling Respondents to take the actions they are required to take under Sections 1232(a)(5)(D) and (c)(2)(A).

## COUNT THREE
### Violation of TVPRA, 8 U.S.C. § 1232(a)(5)(D), (c)(2)(A), and Administrative Procedure Act, 5 U.S.C. § 706(2) (Arbitrary and Capricious Agency Action and Action in Excess of Authority)

130.     Petitioners reallege and incorporate the allegations of all the preceding paragraphs.

131.     The Department of Homeland Security is attempting to remove Petitioners without first placing them in removal proceedings under Section 240 of the Immigration and Nationality Act.

132.     Respondents' failure to place Petitioners in full removal proceedings under INA § 240 violates 8 U.S.C. § 1232(a)(5)(D), which requires that "[a]ny unaccompanied alien child sought to be removed by the Department of Homeland Security . . . *shall* be placed in removal proceedings under section 240 of the Immigration and Nationality Act (8 U.S.C. § 1229a)" (emphasis added).

133.     ORR has failed to place Petitioners in the "least restrictive setting" in compliance with 8 U.S.C. § 1232(c)(2)(A).

134.     Respondents' failure to place Petitioners in the "least restrictive setting" violates Section 1232(c)(2)(A), which requires that "an unaccompanied alien child in the custody of the Secretary of Health and Human Services *shall* be placed in the least restrictive setting that is in the best interest of the child." (emphasis added).

135.     Respondents' disregard of the requirements of 8 U.S.C. §§ 1232(a)(5)(D) and 1232(c)(2)(A) violates the APA in that Respondents' actions are "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

## COUNT FOUR
### Violation of the *Flores* Settlement Agreement

136.    Petitioners reallege and incorporate the allegations of all the preceding paragraphs.

137.    Petitioners are minor children and members of the *Flores* class.

138.    Paragraph 11 of the *Flores* Settlement Agreement requires that Respondents treat children, including Petitioners, "with dignity, respect and special concern for their particular vulnerability as minors," and to place them in "the least restrictive setting appropriate to the minor's age and special needs."

139.    Paragraph 14 of the *Flores* Settlement Agreement requires that when detaining a minor "is not required either to secure his or her timely appearance before [DHS] or the immigration court, or to ensure the minor's safety or that of others, [the government] *shall* release a minor from its custody without unnecessary delay, in the following order of preference, to: A. a parent; B. a legal guardian; C. an adult relative (brother, sister, aunt, uncle, or grandparent) . . ." (emphasis added).

140.    Paragraph 18 of the *Flores* Settlement Agreement requires that the government must make and record its prompt and continuous efforts to effect family reunification and release of the minor.

141.    Respondents have not made prompt and continuous efforts to release Petitioners from their custody without unnecessary delay to their father, despite the fact that detention is not required to secure their timely appearance in immigration proceedings or to ensure their safety or that of others.

142.     Respondents' failure to release Petitioners to their father, who is not only a suitable sponsor, but also a parent who is given preference for release, violates Respondents' obligations under the *Flores* Settlement Agreement.

## COUNT FIVE
**Violation of 8 C.F.R. §§ 239.1, 1239.1; *Accardi* Doctrine & Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (Arbitrary and Capricious Agency Action)**

143.     Petitioners reallege and incorporate the allegations of all the preceding paragraphs.

144.     When DHS seeks to remove any unaccompanied immigrant child, the TVPRA requires that the child "shall be placed in removal proceedings under section 240 of the Immigration and Nationality Act (8 U.S.C. § 1229a)." 8 U.S.C. § 1232(a)(5)(D).

145.     Implementing regulations from EOIR, codified under the heading "Initiation of Removal Proceedings" at Title 8, Part 1239, unequivocally state that "*[e]very removal proceeding conducted under section 240 of the Act* (8 U.S.C. § 1229a) to determine the deportability or inadmissibility of an alien *is commenced by the filing of a notice to appear with the immigration court*." 8 C.F.R. § 1239.1 (emphasis added).

146.     Implementing regulations from DHS, also codified under the heading "Initiation of Removal Proceedings" at Title 8, Part 239, identify which immigration officers may issue a Notice to Appear to "an arriving alien at a port-of-entry" to initiate removal proceedings. 8 C.F.R. § 239.1.

147.     Respondents are attempting to remove Petitioners, who are unaccompanied immigrant children, without placing them in removal proceedings or commencing those removal proceedings by issuing and filing a Notice to Appear with the immigration court.

148.     Respondents' actions violate agency policy and procedures, including those found at 8 C.F.R. §§ 239.1, 1239.1, which state that removal proceedings must be commenced by the filing of a Notice to Appear.

149.     Respondents' actions, as set forth above, should therefore be set aside under the principle articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (ruling that administrative agencies are obliged to follow their own regulations).

150.     Respondents' actions, as set forth above, fail to comply with the issuing agencies' regulations and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

### COUNT SIX
**Violation of Withholding of Removal Statute, 8 U.S.C. § 1231(b)(3), and Administrative Procedure Act, 5 U.S.C. § 706(2) (Arbitrary and Capricious Agency Action and Action in Excess of Authority)**

151.     Petitioners reallege and incorporate the allegations of all the preceding paragraphs.

152.     DHS is attempting to remove Petitioners to their home country of El Salvador, where they and their family were threatened with specific death threats and physically assaulted by the MS-13 gang and their affiliates based on their family's kinship ties and their religious activities.

153.     The 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees, to which the United States is party, requires that the United States not "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." United Nations Convention Relating to the Status of Refugees, art. 33, July 28, 1951, 189 U.N.T.S. 150; *see also* Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267.

154.     The Refugee Convention prohibits the return of individuals to countries where they would face persecution on a protected ground as well as to countries that would deport them to conditions of persecution.

155.     Congress has codified these prohibitions in the "withholding of removal" provision at INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), which bars the removal of an individual to a country where it is more likely than not that he or she would face persecution.

156.     Pursuant to regulation, only an Immigration Judge can determine whether an individual faces such a risk of persecution and is entitled to withholding of removal after full removal proceedings in immigration court. *See* 8 C.F.R. § 1208.16(a).

157.     Respondents' attempt to remove Petitioners to El Salvador, where they are subject to persecution on account of various protected grounds including their family kinship ties and their religious activities, violate 8 U.S.C. § 1231(b)(3)(A), which states that an individual "may not" be removed to a country if that individual's "life or freedom would be threatened in that country because of the [individual's] race, religion, nationality, membership in a particular social group, or political opinion."

158.     Respondents' attempt to remove Petitioners to El Salvador in violation of 8 U.S.C. § 1231(b)(3) violates the APA in that Respondents' actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

## COUNT SEVEN
### Violation of Customary International Law: Prohibition on Refoulement

159.     Petitioners reallege and incorporate the allegations of all the preceding paragraphs.

160.     DHS is attempting to remove Petitioners to their home country of El Salvador, where they and their family were threatened with death based on their family's kinship ties and religious activities and physically assaulted by members and affiliates of the MS-13 gang.

161.     The prohibition on refoulement is a specific, universal, and obligatory norm of customary international law. That norm prohibits returning an individual to a country where the

individual would be subject to torture or where the individual's life or freedom would be threatened on account of their race, religion, nationality, membership of a particular social group, or political opinion.

162.    Respondents' actions in removing Petitioners to El Salvador will cause a grave and foreseeable injury to Petitioners, in violation of the non-refoulement protections afforded to them under international law.

163.    Petitioners do not have an adequate damages remedy at law to address the violations alleged herein.

**COUNT EIGHT**
**Violation of Section 504 of the Rehabilitation Act of 1972, 29 U.S.C. § 794, and Implementing Regulations**

164.    Petitioners reallege and incorporate the allegations of all the preceding paragraphs.

165.    Respondents' continued and indefinite detention of Petitioners, who are children with trauma-related mental health disabilities, including Post-Traumatic Stress Disorder ("PTSD"), violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations.

166.    Section 504 of the Rehabilitation Act of 1972 ("Section 504") provides that "no otherwise qualified individual with a disability . . . shall solely, by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a); *see also* 45 C.F.R. § 85.21.

167.    The Rehabilitation Act defines "disability" to include "a physical or mental impairment that substantially limits one or more major life activities . . . ." 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1)(A).

168.     Petitioners suffer from trauma-related mental health disabilities, including PTSD that cause an impairment that limits their ability to concentrate, think, and communicate. Petitioners thus have a physical or mental impairment that substantially limits one or more major life activities.

169.     Respondents' detention and separation of Petitioners from their father/stepfather exacerbates Petitioners' existing limitations in communication, including when relating their past trauma. As a result, Petitioners face barriers in presenting their claims and are being denied equally effective access to the asylum process on the basis of disability.

170.     Petitioners are "otherwise qualified" to participate in any removal proceedings currently pending against them and in affirmative asylum proceedings, as well as in the programs and activities of their temporary placement by ORR in a children's shelter.

171.     The children's shelter where Petitioners are currently detained has a contract with ORR and has received substantial federal financial assistance. Immigration proceedings, including asylum adjudications before USCIS and removal proceedings prosecuted by ICE before an Immigration Judge, are federal programs.

172.     The regulations implementing Section 504 prohibit entities receiving federal assistance from, directly or through contracts or licensing, utilizing "criteria or methods of administration the purpose or effect of which would (i) subject qualified individuals with handicaps to discrimination on the basis of handicap; or (ii) defeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with handicaps." 45 C.F.R. § 85.21(b)(3).

173.     In separating Petitioners from their father and continuing their detention, Respondents have exacerbated Petitioners' disabilities; interfered with their ability to

meaningfully participate in immigration proceedings; excluded them from the protections afforded by the asylum statutes, including becoming riders on their father's pending asylum claim, seeking their own asylum claim, and/or seeking Special Immigrant Juvenile Status; and have discriminated against Petitioners on the basis of their disability.

174.     Respondents have a legal duty to provide reasonable accommodations to Petitioners to ensure their meaningful access to the federal programs of asylum and removal proceedings and family reunification for unaccompanied immigrant children.

175.     There are effective reasonable accommodations that Respondents could implement but have failed to so. In particular, through reunification, Respondents could immediately cease the Petitioners' continued detention in ORR custody and their forced separation from their father. Respondents could also give Petitioners the full process and protections afforded by the TVPRA, the *Flores* Settlement Agreement, and asylum provisions of the INA, which together are designed to accommodate children navigating a complicated legal immigration and asylum process, and provide a full and fair hearing for Petitioners' asylum claims. Respondents have failed to implement any reasonable accommodations.

176.     The reasonable accommodation requested by Petitioners would not be unduly burdensome, nor would it require a fundamental alteration in the program. The burden of showing that any such relief or accommodation would require a fundamental alteration or pose an undue burden rests with Respondents. 6 C.F.R. § 15.50(a)(2).

177.     Respondents' actions, including separating Petitioners from their mother and father through MPP, continuing Petitioners' detention, refusing to release Petitioners to their father/stepfather, and denying Petitioners a full removal proceeding under INA § 240, 8 U.S.C. §

1229a, are exacerbating Petitioners' disabilities and denying Petitioners equal and effective access to a federal program.

178.    As a result of this discrimination and failure to reasonably accommodate Petitioners' disabilities, and solely based on their disabilities, Petitioners cannot receive the benefits of the asylum process or the placement by Respondents in the least restrictive setting appropriate to their age and special needs.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request that this Court:

a.    Assume jurisdiction over this matter;

b.    Pending final resolution of this petition, and pursuant to the Court's inherent powers, order Respondents to take all steps necessary to effectuate Petitioners' prompt release to their father, Jose C., or order expedited briefing and a hearing on the Petition as soon as possible so that Petitioners may be promptly reunited with their father;

c.    Award the writ or issue an order directing the Respondents to show cause why the writ should not be granted, pursuant to 28 U.S.C. § 2243, within three days;

d.    Order that Respondents comply with 8 C.F.R. §§ 239.1 and 1239.1 by issuing and filing a Notice to Appear for each Petitioner to commence removal proceedings conducted under INA § 240;

e.    Order that Respondents comply with 8 U.S.C. § 1232(a)(5)(D) by placing Petitioners in full removal proceedings under INA § 240, with all protections provided in such proceedings, including opportunity to present their asylum claims to a USCIS asylum officer in a non-adversarial setting;

f.      Order that Respondents comply with 8 U.S.C. § 1232(c)(2)(A) and the *Flores* Settlement Agreement by placing Petitioners in the least restrictive setting that is in the best interest of the Petitioners by taking all steps necessary to effectuate Petitioners' prompt release to their father, Jose C., within a maximum of two weeks;

g.      Declare that Respondents' failure to place Petitioners in full removal proceedings under INA § 240 violates the Due Process Clause of the Fifth Amendment, 8 U.S.C. § 1232(a)(5)(D), 5 U.S.C. § 706, and Section 504 of the Rehabilitation Act and its implementing regulations;

h.      Declare that Respondents' failure to place Petitioners in the least restrictive setting/release Petitioners to their father/stepfather violates the Due Process Clause of the Fifth Amendment, 8 U.S.C. § 1232(c)(2)(A) and the *Flores* Settlement Agreement, 5 U.S.C. § 706, and Section 504 of the Rehabilitation Act and its implementing regulations;

i.      Stay the removal order against Petitioners, if and when the Harlingen Immigration Court's stay on Petitioners' removal order is lifted, to maintain the status quo and allow Petitioners to seek relief on the aforementioned counts from this Court;

j.      Award Petitioners their attorneys' fees and costs; and

k.      Grant any other relief this Court deems just and proper.

March 17, 2020

Respectfully submitted,

David J. Leviss (DC Bar No. 1003724)
Jeremy Maltby (DC Bar No. 473825) (*pro hac vice forthcoming*)
Evan N. Schlom (DC Bar No. 1028758) (*pro hac vice forthcoming*)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300 (phone)
(202) 383-5414 (fax)
dleviss@omm.com
jmaltby@omm.com
eschlom@omm.com

William J. Martin (*pro hac vice forthcoming*)
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000 (phone)
(212) 326-2061 (fax)
wmartin@omm.com

Ryan Murguía (*pro hac vice forthcoming*)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000 (phone)
(213) 430-6407 (fax)
rmurguia@omm.com

Adina Appelbaum (DC Bar No. 1026331)
Claudia R. Cubas (*pro hac vice forthcoming*)
Samantha Hsieh (*pro hac vice forthcoming*)
CAPITAL AREA IMMIGRANTS' RIGHTS (CAIR) COALITION
1612 K Street, NW
Washington, DC 20006
(202) 899-1416 (phone)
(202) 379-9052 (fax)
adina@caircoalition.org
claudia.cubas@caircoalition.org
sam@caircoalition.org

Karen C. Tumlin (*pro hac vice forthcoming*)
Esther H. Sung (*pro hac vice forthcoming*)
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 316-0944 (phone)
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org


*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2020, I hand-filed the foregoing document with the

Clerk of Court for the United States District Court for the District of Columbia.

I further certify that a copy was sent via courier to:  Daniel Van Horn, Chief of Civil

Division, U.S. Attorney's Office, 501 Third Street, NW, Washington, D.C. 20530, along with

copies sent via electronic mail to Daniel Van Horn at Daniel.VanHorn@usdoj.gov, and Heather

Graham-Oliver, Deputy Chief of Civil Division, U.S. Attorney's Office at Heather.Graham-

Oliver@usdoj.gov.

I further certify that a copy of the foregoing was deposited with FedEx, for delivery to the

below Respondents:

WILLIAM P. BARR, in his official capacity
as United States Attorney General
950 Pennsylvania Ave., NW
Washington, D.C. 20530

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW
5107 Leesburg Pike
Falls Church, VA 22041

JAMES McHENRY, in his official capacity
as Director of Executive Office for
Immigration Review
5107 Leesburg Pike
Falls Church, VA 22041

U.S. DEPARTMENT OF HOMELAND
SECURITY
245 Murray Lane, SW
Washington, D.C. 20528

CHAD F. WOLF, in his official capacity as
Acting Secretary of the U.S. Department of
Homeland Security
245 Murray Lane, SW
Washington, D.C. 20528

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT
500 12th St., SW
Washington, D.C. 20536

FRANCISCO MADRIGAL, in his official
capacity as Acting Field Office Director for
the U.S. Immigration and Customs
Enforcement
31 Hopkins Plaza, 6th Floor
Baltimore, MD 21201

MATTHEW T. ALBENCE, in his official
capacity as Deputy Director and Senior
Official Performing the Duties of the Director
of the Immigration and Customs Enforcement
500 12th St., SW
Washington, D.C. 20536

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES
20 Massachusetts Ave., NW
Washington, D.C. 20529

KENNETH T. CUCCINELLI, in his official
capacity as Senior Official Performing the
Duties of the Director of U.S. Citizenship and
Immigration Services
20 Massachusetts Ave., NW
Washington, D.C. 20529

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 Independence Ave., SW
Washington, D.C. 20201

ALEX AZAR, in his official capacity as
Secretary of the Department of Health and
Human Services
200 Independence Ave., SW
Washington, D.C. 20201

OFFICE OF REFUGEE AND
RESETTLEMENT
330 C Street, SW
Washington, D.C. 20201

JONATHAN HAYES, in his official capacity
as Director of the Office of Refugee and
Resettlement
330 C Street, SW
Washington, D.C. 20201

HILDAMARIA POWELL, in her official
capacity as Federal Field Specialist at the
Office of Refugee and Resettlement
330 C Street, SW
Washington, D.C. 20201

BETHANY CHRISTIAN SERVICES
2142 Priest Bridge Court #1
Crofton, MD 21114

OLUBUNMI AKINKUOWO, in her official
capacity as Executive Director of Bethany
Christian Services
2142 Priest Bridge Court #1
Crofton, MD 21114

David J. Leviss (DC Bar No. 1003724)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 2006
(202) 383-5300 (phone)
(202) 383-5414 (fax)
dleviss@omm.com